## MOSES GREENWOOD v. LOWE and PATTISON.

A debtor of defendants furnished them with his name, in the form of a draft on their house. The draft was accepted by defendants, and exchanged with *Partee & Co.*, for bills on their house in New York. *Partee & Co.* placed the acceptance of defendants in the hands of a broker to raise money on it. It was sold to *P. P. & Co.*, with the right reserved for *Partee & Co.* to take it back on certain terms, within a stipulated time. *Partee & Co.* did not redeem it within the time, and the broker who sold, now bought it of *P. P. & Co.* The broker exchanged the acceptance of defendants thus obtained, with the plaintiffs for other bills of larger amount, and paid the difference. Defendants contest the plaintiffs' ownership of the acceptance, on account of the manner in which it was disposed of by the broker and obtained by the plaintiff.

The court *held*: That the plaintiffs were holders for value, for according to the well settled doctrine of the commercial law, a merchant who gives his own negotiable paper for a purchase of negotiable paper, gives value, as well as he who gives gold or bank notes.

The law, from considerations of public policy, and in order to favor the free circulation of bills of exchange and other negotiable paper, looks with favor upon the holders of a bill who has given value for it, and requires very cogent evidence to convict him of *mala fides*.

Where, under the facts shown, the court may reasonably suppose a state of opinion, or belief in a party's mind, which is entirely consistent with honesty and fair dealing, and where there is another hypothesis involving dishonesty, it will be the duty of the court, unless the scale clearly preponderates in favor of the latter, to adopt that construction which is in favor of innocence.

Where the opinion of the court is founded upon its own knowledge of the course of trade, and not on proof of it in the record, the cause was remanded for a new trial by a jury of merchants.

APPEAL from the Fourth District Court, *Strawbridge*, J. *Edwards* and *Olcott*, for the plaintiff. *A. N. Ogden*, for defendants. By the court:

SLIDELL, J. This suit is brought upon a bill of exchange, drawn in Alabama, December 26, 1850, upon the defendants, by *Alexander Pattison*, to the order of and endorsed in blank by *William H. Pattison*, for $3523 75, payable at twelve months.

The defendants in their answer, denied that the plaintiffs were lawful holders; asserted that *Partee & Co.* are the legal owners of the draft, and that they have claims against *Partee & Co.* upon certain protested bills of exchange, drawn by them to an amount exceeding the amount of the bill sued upon.

There was a judgment in favor of the defendants in the court below, declaring the acceptance extinguished by compensation. The claims of the plaintiffs being rejected, upon the ground that they did not take the bill in the ordinary course of business. From that judgment, the plaintiffs have appealed.

It appears, that the defendants were merchants in New Orleans, and gave this bill, thus accepted by them, together with other bills by them accepted, before maturity, to *Partee & Co.*, of New Orleans, in consideration of several bills of exchanges drawn by *Partee & Co.*, on their own firm in New York, which latter bills came back protested, and the defendants having been obliged to take them up as endorsers, are now the holders thereof. *Partee & Co.* failed sometime in the fall of 1851.

It will be observed, that in this transaction *Lowe* and *Pattison*, the acceptors, were the persons who thus issued and negotiated their own acceptances. To a lawyer, applying to such a case, the technical doctrines which govern in the general the contracts of a bill of exchange, or perhaps to a foreign merchant,

GREENWOOD
v.
LOWE.

the transaction would seem anomalous. For as a general rule, when a bill gets into the hands of the acceptor, the contract is *functus officio*. But this seeming incongruity is explained by the common course of business in New Orleans, with which every merchant here is familiar, and to which it would be unreasonable for us to shut our eyes, since it has so frequently been illustrated by our records in commercial cases. That course of business is this: The planters, as a class, are in constant need of advances; the New Orleans factors, as a class, are in as constant need of discounts. Out of this state of things, has arisen the notorious practice of the factor receiving from the planter his bill on the factor, which the latter accepts, and gets discounted in the market, puts the proceeds to the planter's credit, and looks to the promised shipment of his crops to place the acceptor in funds to meet the bill. Acceptances to the amount of many hundreds of thousands of dollars, are thus, we have no doubt, thrown into the New Orleans bill market annually.

In September, 1851, *Partee & Co.* were much pressed for money, and in the hope of warding off impending failure, *Partee* gave his clerk, *Greenland*, orders to use all the paper the house had, in order to sustain its credit until *Partee's* return from the north. Accordingly, on the 20th September, *Greenland* put *Lowe* and *Pattison's* acceptance into the hands of one *Wartelle*, of the house of *Wartelle* and *Jackson*, money brokers, telling him he wanted to raise $3000 on it, by selling it for that sum, with the privilege of getting it back at the end of seven days, if he desired, at an advance named. *Wartelle* on the same day, sold the draft to *Pickett, Perkins & Co.* for $2980 cash, and with the privilege of getting it back in seven days, on paying $3000. From the amount thus received, he deducted his commissions, $10, and gave the balance $2970 on the same day to *Greenland*. On the last day of the time stipulated, *Partee & Co.* were unable to the raise the money to get back the bill; and *Greenland*, their clerk, came to *Wartelle*, and asked him to apply to *Pickett, Perkins & Co* for an extension, which they refused, saying they would sell the draft for $3000 to any one that wanted it. This *Wartelle* reported to *Greenland*, and late in the evening of the same day, *Wartelle* thinking, as he says, that *P. P. & Co.* would sell the bill to some one else, and that he could make something by buying it, bought it himself, for $3000. This fact he concealed from *Greenland*, to whom, when the latter subsequently made inquiries about the bill, he replied that *Pickett, Perkins & Co.* had sold it. It is proper to observe, that *Greenland* disagrees with *Wartelle's* statement to this extent, that he denies having previously authorized *Wartelle* to make a sale of the bill; but he admits an authorization to raise money on it, and the receipt of $3000 from *Wartelle;* and does not say, that when informed of the sale and its terms, he disapproved. Whatever was the truth upon this point, it is at least certain, that *Partee & Co.* had parted with their interest in the bill to the extent of $2980, and that they would have no right to recover the bill from *Wartelle*, or any one holding under *Wartelle*, without reimbursing that amount.

Soon after this, *Partee & Co.* failed. *Wartelle*, on the 3d October, sold the bill to *Greenwood & Co.*, who are not proved to have had any knowledge of the antecedent circumstances. The facts relating to this purchase, are as follows: They had a few days previous employed *Wartelle* to sell two bills, accepted by themselves, and on the 3d October, *Wartelle* agreed to take these two bills amounting in principal to $4263, and maturing in the following February and March, at a discount of one per cent a month, and to give *Greenwood & Co.* in payment *Lowe* and *Pattison's* acceptance, at two per cent a month, and pay

*Partee & Co.*, the difference, $686 25 in cash. The transaction was so closed on that day. *Wartelle* afterwards negotiated the two acceptances of *Greenwood & Co. Partee & Co.* made a *cessio bonorum* in March 1851; and the defendants are still holders of their protested exchange, to an amount of say $19,000.

The right of the plaintiffs to recover, depends upon the answers to these questions. Are they holders for value? Are they holders *bona fide*, and in the ordinary course of business?

They are clearly holders for value. For according to the well settled doctrine of the commercial law, a merchant who gives his own negotiable paper for a purchase of negotiable paper, gives value as well as he who gives gold or bank notes. Are they holders, *bona fide*, and in the ordinary course of business?

This law from considerations of public policy, and in order to favor the free circulation of bills of exchange and other negotiable paper, looks with favor upon the holders of a bill who has given value for it, and requires very cogent evidence to convict him of *mala fides*.

Where is the fact in this case, which can justly be said to bring home to the mind the conviction, that the plaintiffs acted in bad faith? It is not pretended that they had any, the slightest actual notice, that *Partee & Co.*, the former holders, had an equitable interest in the excess of the bill over $2980, (the cash they had received upon it,) nor that *Lowe* and *Pattison*, had negotiated the bill for a consideration, which was about eventually to fail. Is there anything in the character or occupation of *Wartelle*, which should have excited their alarm? We think not. He was a person professionally engaged in the business of buying and selling bills and notes, and is not shown to have been in bad repute. Is there anything necessarily indicative of *mala fides* in the rate at which the bill was discounted? The evidence does not authorize us to say so, nor can we infer it with what knowledge we have of the pressure, which exists at frequently recuring intervals in the New Orleans money market, and of the precarious character of certain classes of mercantile paper. *Partee & Co.* were willing to borrow at this very time $3000, at one per cent a week. The rate deducted by plaintiff may be fairly considered, as indicating a doubt about the solvency of *Lowe* and *Pattison*, and a desire to get a premium, commensurate to the risk; but we do not believe a jury of business men in New Orleans would be found, who would say, that such a discount of the bill in question, at that season of the year, would authorize the belief of a suspicion in the mind of the plaintiffs, that *Wartelle*, a bill broker, had not a right to negotiate the bill, and that there were outstanding equities.

We come now to the only other circumstance, on which the defendants rely as indicative of *mala fides*; and that is, that they gave their own acceptances for it to a broker, who, it is said, from the nature of his calling, they should have looked upon as a person authorized to make sales of paper, and not exchanges. Parties, themselves, often make exchanges of their paper. This cross acceptance, for mutual accommodation, are not uncommon among merchants; and we do not see why suspicion should attach, when that is done through an agent, which, if done between the parties themselves, would not be deemed extraordinary. Where we may, under the facts shown, reasonably suppose a state of opinion or belief in a party's mind, which is entirely consistent with honesty and fair dealing, and where there is another hypothesis involving honesty, we are bound, unless the scale clearly preponderates in favor of the latter, to adopt that construction which is in favor of innocence. *Greenwood & Co.* may have reasoned with themselves, that it was for their advan-

GREENWOOD
v.
LOWE.

tage to get for their own paper, having several months to run, a sum in cash, and an acceptance, maturing some months earlier, at a rate of discount, which according to their knowledge of *Lowe* and *Pattison's* standing, compensated the risk of the acceptor's failure in the short interval, before its maturity; and *Wartelle* or his principal, might be considered by *Greenwood & Co.*, as looking for their advantage in the bargain to the superior value, which they chose to attach to *Greenwood & Co.*'s paper. It was certainly a circumstance to awaken a suspicion in the minds of the plaintiffs as to the solvency of *Lowe* and *Pattison*, but not necessarily as to the title of *Wartelle*, or those for whom he was acting. But a serious difficulty seems to have arisen in the mind of the district judge, from the fact, that *Greenwood & Co.* gave in this exchange of paper, their own acceptances of bills, drawn on them by planters. He reasons thus. "How did they obtain before maturity, their own paper? That is unexplained. The supposition is, that they had discounted it in market. But, however they obtained it, when it came into the hands of the debtor, it was extinguished, and they had no right to re-issue it to the prejudice of the other parties to it; this must have been as well understood by the brokers who received it from them, as the unusual mode of discounting the defendant's note. must have appeared to *Greenwood:* and either was sufficient to have put any prudent man on his guard."

Now, what the learned judge has said is correct, if what we believe to be the every day course of business, with regard to planter's and factor's papers, is disregarded; but it leads to an unsafe conclusion, if that course of business is considered. But how is justice to be administered among our merchants, if we shut our eyes to what is every day passing before us? And are we not bound to reach the justice of a case, whenever we can do so without violating some inflexible legal rule? We do not hesitate in giving an affirmative answer to this question. Now the general rule of the commercial law, which regulates the rights and liabilities of parties to negotiable paper, are not inflexible. An acceptor, whose obligation on its face is primary, may show, that in point of fact, the maker is his debtor, and that he accepted for accommodation. So when the planter draws on his factor and he accepts, if the acceptor gets the bill into his hands by payment or purchase, he cannot re-issue it, so as to hold the drawer, to the person receiving it from the acceptor. But if the planter sends the bill to the factor for the purpose of enabling him to issue it, when accepted, and so raised money for him on it, he would attempt in vain to shelter himself under the general rule.

It is strange, that the defendants should deduce the inference of *mala fides*, from the plaintiffs having done the very thing which the defendants themselves did. For they, the acceptors, negotiated their own acceptances with *Partee & Co.*

After the best consideration which we have been able to give to this case, we are unable to bring our minds to the conclusion, that the judgment of the court below has done justice between the parties. But as the views we have expressed, are founded rather on our knowledge of the course of business in New Orleans, derived from our professional and judicial experience, than upon the evidence in this particular case, and as it is desirable to know what a jury of merchants would think in a matter of this sort, which involves a question of mercantile good faith, we have concluded, that the safer course for obtaining justice, will be to remand the cause for further evidence, and for a new trial by such a jury.

Judgment reversed; remanded for trial by a jury of merchants; defendant to pay costs of the appeal.