(83 South. 218)

No. 22038.

AMERICAN NAT. BANK v. PATTERSON.

(June 2, 1919.  On Rehearing, Nov. 3, 1919.)

*(Syllabus by the Court.)*

1. BILLS AND NOTES ⬅95—CONSIDERATION; EXCHANGE OF NOTES.

One promissory note is a good and sufficient consideration for another given in exchange therefor.

2. BILLS AND NOTES ⬅362 — PURCHASER FROM BONA FIDE HOLDER; RIGHTS OF TRANSFEREE.

The holder and owner of a negotiable promissory note, acquired for good and sufficient consideration, may use it for the extinguishment of his obligations, and when so used his transferee is entitled to recover the amount thereby called for, as is also the transferee of his transferee, even though the latter acquires the instrument after maturity.

3. BILLS AND NOTES ⬅348, 404(1)—UNREASONABLE DELAY IN DEMANDING PAYMENT OF DEMAND NOTE.

Seven months is an unreasonable time for a national bank in a failing condition to delay demanding payment of a demand note, and another bank, which after such delay takes over its assets and agrees to pay its debts, is not a holder in due course of the note so acquired.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by the American National Bank against A. L. Patterson. Judgment for defendant, and plaintiff appeals. Reversed, and judgment rendered for plaintiff.

Orville A. Park, of Macon, Ga., and Dart, Kernan & Dart, of New Orleans, for appellant.

John May, of New Orleans, and R. B. Ellis, of Center Point, Tex., for appellee.

## Statement of the Case.

MONROE, C. J.  Plaintiff prosecutes this appeal from a judgment rejecting its claim as holder for value before maturity of defendant's note, reading (in part):

"$10,000.00.        Macon, Georgia, 1—4—1914.

"On demand, after date, I, we, or either of us, promise to pay to the order of the Commercial National Bank of Macon, Georgia, ten thousand dollars.

"For value received, payable at said bank, with interest from date, at the rate of eight per cent. per annum, with all costs of collection, including ten per cent. attorney's fees."

And then follow certain waivers and a stipulation which are not involved in this controversy, and the signature of the defendant, as the maker of the note.

Defendant, in an answer setting forth a good many details, pleads want of consideration, and denies that plaintiff has full ownership of the note.

The facts of the case, as we interpret the evidence, are as follows:

Defendant resided and was engaged in business in New Orleans. His uncle, J. J. Cobb, resided in Macon, Ga., and was vice president of the Commercial National Bank and cashier of the Commercial Savings Bank of that city. Cobb's brother-in-law, Mallary, was president of both of those institutions, and Mallary's stepson, Lewis, was cashier of the one and assistant cashier of the other. For some years prior to the transaction out of which this litigation has arisen, defendant and Cobb had frequently exchanged notes for their mutual accommodation, and shortly before January 4, 1914, Cobb wrote to defendant, requesting him to make such an exchange, saying that he did not wish to put his own note in the bank (meaning the bank of which he was an officer), that he hoped to return the note which defendant might furnish within a short time, and that he would have the president and cashier of the bank (meaning the Commercial National) guarantee the note that he would furnish, to which request defendant gave his assent, and the exchange was effected; he forwarding to Cobb the note sued on, and Cobb forwarding to him his (Cobb's) note for a like

amount, payable on demand to the order of A. L. Patterson & Co., after which, on January 12th, Mallary and Lewis mailed to defendant a guaranty reading:

"We hereby guarantee the note of J. J. Cobb, held by you, in the sum of $10,000.00, for which you have given your demand note of like amount in favor of the Commercial National Bank. We have received from J. J. Cobb certificates of stock to the value of $10,000.00, which we likewise hold for your security."

The certificates thus referred to represented stock in the two banks of which Mallary, Lewis, and Cobb were officers, and somewhat later (prior to August 1st) they were withdrawn by Cobb and bonds of an Alaska Mining Company, of the par value of $10,000, were substituted in their stead; the explanation thereof, as given by Lewis, in his testimony, being as follows:

"In the early summer of 1914 the Commercial National Bank had received some severe criticism as to its condition by the bank examiner, and Mr. Cobb became somewhat worried about the value of the security he had behind his note of Patterson, and he took those bonds [certificates?], and put in their stead $10,000 worth of first mortgage bonds of the Eagle River Mining Company."

As the Commercial National Bank failed on or about August 1st following, it is evident that the exchange of collaterals was made in the interest of the defendant, and, though he was not consulted about it at the time, he accepted the bonds after the failure of the bank, and states, in his answer, that he now has them in his possession, but that they have no market value, and that he is willing to surrender them in the event of his being discharged from liability with respect to the claim here set up.

Concerning the disposition that was made of the proceeds of the note here sued on, we have only the testimony of the three bank officers:

Mallary, the president, was able to testify that Cobb came to him one day and stated that he had a note of Mr. Patterson that he would like the bank (Commercial National) to discount, and that, after discussing the matter with him and Lewis, he agreed to the discount. He goes on to say that the note was discounted by the bank, and that he understood that Cobb received the proceeds; but his subsequent examination shows that, save as to his consent to the discount, he knew nothing about the matter except what he was told—by Lewis or Cobb.

Cobb gives the following, with other testimony, to wit:

"Q. Were you indebted to the Commercial National Bank? If so, in what way? A. I suppose the money was turned over— Q. Tell us what you know. * * * Q. Do you know whether or not it was applied to any obligation of yours with the Commercial National Bank? A. I did not have any that it could have been applied to, as far as I can recall now. * * * I had obligations that Mr. Lewis was looking after for me, and I wanted to put them in better shape and relieve him of that. Q. To whom were these obligations due? A. I think in the Commercial Savings Bank—I said obligations— they were things that I felt that I was more responsible for, and I wanted to relieve him of carrying them in the shape they were. Q. Do you know they were not Commercial National obligations? A. I think so—I am not sure—I think so. Q. What kind of obligations were they? A. They were some that I felt responsible for, occasioned by a loss of a former employé of my insurance agency, or bond agency, and some indebtedness for carrying life insurance premiums. Q. Whose were they? A. Mr. E. Y. Mallary's and my own, principally; they were for the benefit of the bank; and some obligations in connection with the Eagle River mine, and there were others I do not recall now. * * * Q. Did not Mr. Patterson's note liquidate all those obligations, or did you raise some other money in addition to that? A. Some other money. Q. Did that have anything to do with the fact that you cannot recall definitely what were paid from the proceeds of this note and what were paid from other sources? A. My recollection is that I simply had Mr. Mallary O. K. the note and left it with Mr. Lewis to use as he saw best. Q. In caring for those obligations you speak of? A. Yes, sir."

Lewis, after testifying, categorically, that he discounted the note for Cobb, and paid him $10,000 in cash, that the Commercial National Bank had no interest in the matter (not being the creditor of Cobb), except to buy the note from him, that it paid him full value therefor, and that the note was sold by the bank, with its other assets, gives the following further testimony, on his cross-examination:

"Q. This money, the $10,000 which Mr. Patterson's note was discounted for, how was that paid to Mr. Cobb? A. Mr. Cobb, I think, used that money in the Commercial Savings Bank. * * * Q. It was not put in the Commercial National Bank and checked out by Cobb for any other purpose, for all you know? A. No, sir. * * * My impression is that Mr. Cobb used that money and took up some papers on which he considered himself morally and not legally bound. Q. They were taken up in the Savings Bank, of which you were an officer? A. Yes, sir. * * * Q. You don't know what these obligations were that were taken up in the Commercial Savings Bank? A. No, sir; I have no doubt but what I knew at the time, but I don't know now. Q. Was the money immediately applied to the taking up of the obligations, or did it stay in the Commercial National Bank for any length of time? A. I think it was immediately applied. Q. Do you know who applied it—Mr. Mallary or Mr. Cobb? A. Very probably I did. Q. You applied the money yourself to the obligations in the Commercial Savings Bank? A. Yes, sir. Q. Mr. Cobb had no charge of the money, individually, except in so far as you applied it to those obligations? A. He handed me the note. Q. He handed you the note, and you took the money and paid those obligations to the Commercial Savings Bank? A. Yes, sir. * * * He owed the Commercial National nothing. * * * Q. This paper of Patterson went along with the other assets of the Commercial National Bank, when the American National Bank took over the assets? A. Yes, sir. * * * Q. The consideration of the transfer of those assets was that the American National Bank should pay the debts of the Commercial National Bank and repay itself out of the assets of the Commercial National Bank—practically so? A. Yes, sir. * * * Q. Were the papers that were paid to the Commercial Savings Bank obligations upon which Mr. Cobb was either maker, indorser, surety, or how was it? A. He did not appear in any of these ca-pacities. Q. What were those papers? A. I cannot recall what they were. Q. What sort of papers were they? A. They were loans held by the bank on which it was stated Mr. Cobb was not directly liable, either as maker, indorser, guarantee, or surety; but they were papers with some doubt as to their collection, and for which Mr. Cobb felt a sense of moral responsibility and wanted to take up."

It seems to be conceded that no demand was made for the payment of the note here sued on until after it had come into the possession of the plaintiff, or say some eight months after its date.

## Opinion.

[3] The Negotiable Instruments Law (as enacted in this state) declares that, where a negotiable instrument is payable on demand, presentment must be made within a reasonable time after its issue (an exception being made in the matter of the presentment for payment of bills of exchange), that, if it is negotiated an unreasonable time after its issue, the holder is not deemed a holder in due course; and that, "in determining what is a 'reasonable time,' or an 'unreasonable time,' regard is to be had to the nature of the instrument, the usage of trade or the business (if any) with respect to such instruments, and the facts of the particular case." Act No. 64 of 1904, §§ 53, 71, and 193. There is no evidence before us as to the usages of trade; but, considering the nature of the instrument here in question, the fact that it was held by a national bank for seven months, while the bank was drifting towards failure, and that plaintiff acquired it after the bank had failed, without having made demand for its payment, we are of opinion that plaintiff cannot be regarded as a holder in due course, and hence that, as to its right of recovery, it stands in the shoes of the Commercial National Bank, from which the instrument was acquired.

Counsel for defendant admitted, in their

first brief, that there was "a technical consideration" for the note, as between Cobb and Patterson, but argued that this is not a suit by Cobb; that he has no interest in it; that he did not indorse the note to the Commercial National Bank; and that the party in interest is the plaintiff, by which it was acquired after maturity, and which, therefore, has only such rights as the payee might have had. In their "second, or reply," brief the learned counsel announced the discovery that, as the note which the defendant received from Cobb was made payable to the order of A. L. Patterson & Co., and not to the order of A. L. Patterson, the defendant, A. L. Patterson, did not receive even a technical consideration for the note which he gave in exchange.

[1] The question of the exchange of notes was, however, the subject of a correspondence between defendant and Cobb, and, as Cobb apparently wanted defendant's note to be made payable to the order of the Commercial National Bank, it is fair to assume that defendant preferred to have Cobb's note made payable to A. L. Patterson & Co. At all events, he accepted the note in that form; he has retained it up to the present time without complaint on that score; and it is not now suggested that it is any the less available to him, personally, because so drawn. The fact that the notes were made as they were, with the full knowledge and approval of the parties to the exchange, in no wise, therefore, affects the question of the consideration; and, whilst it appears to us that "technical consideration" is about all that is required for the purposes of the case, the authorities are agreed that one promissory note is a good and sufficient consideration, for another, given in exchange. Joyce, Defenses to Commercial Paper, § 227; Randolph, Commercial Paper, §§ 479, 480; Selover, Negotiable Instruments, p. 103, § 66; Tiedeman, Commercial Paper, p. 286, § 172a;

Greenwood v. Lowe, 7 La. Ann. 197; Rice v. Grange, 131 N. Y. 149, 30 N. E. 46; Crampton v. Newton's Estate, 132 Mich. 149, 93 N. W. 250; Franklin Nat. Bank v. Roberts Bros. Co., 168 N. C. 473, 84 S. E. 706.

[2] Having, then, acquired defendant's note for a good and sufficient consideration, Cobb was at liberty to make of it the use that he had in view when he acquired it, and of which the defendant was fairly advised, since the note was made payable to the order of the Commercial National Bank, and it was obvious that it was intended for negotiation through that bank. The learned counsel argue that it was not "discounted" by the bank, since the date of its maturity was not fixed, and, according to the testimony of Lewis, no discount was deducted, to which it may be added that the proceeds were not credited to Cobb in the ordinary way, and were not checked out by him.

Notwithstanding, however, that the testimony of Lewis is not as frank as it should have been, and inspires no great confidence, we are satisfied, all the circumstances considered, that, in consideration of the receipt of the note, the funds of the Commercial National Bank, to the amount called for upon the face of the note, were used, at the instance of Cobb, in the extinguishment of his obligation, and as it must have entered into defendant's contemplation, when he executed and delivered it, that it would or might be used in some such way, he has no just cause of complaint in the fact that, having served its purpose, he is now called on to pay it.

It is therefore adjudged and decreed that the judgment appealed from be annulled, and that there now be judgment in favor of the American National Bank, plaintiff herein, and against the defendant, Andrew L. Patterson, in the sum of $10,000, with interest thereon at the rate of 8 per cent. per annum from January 4, 1914, until paid, together

with 10 per cent. as attorney's fees, upon the aggregate amount of said principal and interest, and all the costs of this suit.

## On Rehearing.

DAWKINS, J. In disposing of this case on rehearing, we find it unnecessary to further discuss the legal questions involved, as we-feel that they have been fully and properly determined in our former opinion. The matter, in our opinion, has resolved itself to a question of fact as to whether or not the Commercial National Bank, payee of the note, paid to Cobb, or to other persons at his request, the amount thereof, to wit, $10,000. If it did, it makes no difference whether it or the present plaintiff be a third holder, in a legal sense, or not. Defendant evidently intended that the note might be so used, if Cobb saw fit, and if he received the money, or if others received it for his benefit, or at his instance, the Commercial National Bank could have enforced payment in full, and its transferee can do likewise, regardless of what may have been paid therefor. The note would represent a debt owed by defendant, and he would not be concerned as to what consideration the original payee may have been willing to receive for it.

The witness Lewis, who was cashier of the Commercial National Bank, and assistant cashier of the Commercial Trust & Savings Bank, testified that he received from the Commercial National Bank the amount of this note and applied the same to the discharge of obligations in which Cobb was interested at the bank of which he was assistant cashier, all as requested by Cobb. This testimony is corroborated by that of Mallary, who was president of the payee bank, who swore that he approved the loan, and by Cobb, who says that he discussed and concluded such an arrangement with Mallary. It is true that Lewis and Cobb were unable, or at least failed, to give the details with re-

gard to the obligations which were so discharged at Cobb's request; but shall we, on that account hold that the main fact of the Commercial National Bank's having parted with its money had not been established, when defendant was afforded every opportunity for cross-examination, and when he had the right to call for and have produced the books and records, not alone of the Commercial Trust & Savings Bank, but also of the Commercial National Bank, or to take the testimony of those now having the custody of same, which was not done? It does seem that it would have been a very easy matter to have proven, by the note register and cash account of the payee bank of the date of the alleged loan, whether or not it had been made. There is no proof to the contrary in the record, other than the inference to be drawn from the failure or inability of Lewis and Cobb to detail the items to which the proceeds of the note were applied, at a bank other than that at which the loan was made, and in which the lender bank had no concern.

We conclude that the preponderance of the evidence shows that the loan was made, and for this reason our former decree is reinstated and made the final judgment of this court.